## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **JOSEPH L. SHULAR,** | ) | |
| Plaintiff | ) | |
| | ) | Civil Action No. 2:18cv00044 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| **ANDREW SAUL,**[1] | ) | |
| **Commissioner of Social** | ) | By: PAMELA MEADE SARGENT |
| **Security,** | ) | United States Magistrate Judge |
| Defendant | ) | |

### I. Background and Standard of Review

Plaintiff, Joseph L. Shular, ("Shular"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). This case is before the undersigned magistrate judge by transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is automatically substituted as the defendant in this case pursuant to Fed. R. Civ. P. Rule 25(d).

a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "'substantial evidence.'"" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Shular protectively filed his application for DIB on November 30, 2014, alleging disability as of October 31, 2014, based on herniated disc and damage to sciatic nerve, depression, arthritis, sciatica, mood swings, anxiety; insomnia; and anger. (Record, ("R."), at 15, 196-97, 236, 269.) The claim was denied initially and upon reconsideration. (R. at 70-79, 81-92, 94-96, 103-10.) Shular then requested a hearing before an administrative law judge, ("ALJ"). (R. at 111-12.) The ALJ held a hearing on June 27, 2017, at which Shular was represented by counsel. (R. at 33-69.)

By decision dated October 20, 2017, the ALJ denied Shular's claim. (R. at 15-26.) The ALJ found that Shular met the nondisability insured status requirements of the Act for DIB purposes through December 31, 2019. (R. at 17.) The ALJ found that Shular had not engaged in substantial gainful activity since October 31, 2014, the alleged onset date.[2] (R. at 17.) The ALJ found that the medical evidence established that Shular had severe impairments, namely degenerative disc disease of the lumbar spine, chronic obstructive pulmonary disease, ("COPD"), migraine headaches, major depressive disorder and generalized anxiety disorder, but he found

---

[2] Therefore, Shular must show that he was disabled between October 31, 2014, the alleged onset date, and October 20, 2017, the date of the ALJ's decision, in order to be eligible for benefits.

that Shular did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 18-20.) The ALJ found that Shular had the residual functional capacity to perform light[3] work, to stand and/or walk six hours in a workday, sit six hours in a workday, occasionally climb ramps and stairs, crawl, crouch, kneel and stoop, and never climb ladders, ropes or scaffolds, work around pulmonary irritants, vibration or hazards such as machinery or unprotected heights. (R. at 20-25.) The ALJ found that Shular could perform simple, routine tasks in a work environment with few day-to-day changes. (R. at 20.) The ALJ found that Shular could not perform his past relevant work, but, based on Shular's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Shular could perform, including jobs as an assembler, a packer and a sorter. (R. at 25-26.) Thus, the ALJ concluded that Shular was not under a disability as defined by the Act, and he was not eligible for DIB benefits. (R. at 26.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Shular pursued his administrative appeals, (R. at 181), but the Appeals Council denied his request for review. (R. at 1-3.) Shular then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Shular's motion for summary judgment filed May 14, 2019, and the Commissioner's motion for summary judgment filed July 8, 2019.

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

## II. Facts

Shular was born in 1972, (R. at 25, 196), which classifies him as a "younger person" under 20 C.F.R. § 404.1563(c). He has a high school education and is a certified electrician; he has past work experience as an underground electrician in coal mines and a laborer in a foundry. (R. at 39-41, 237.) Shular testified that he had not attempted work since 2014. (R. at 41.) Shular testified that he suffered a work-related herniated disc in his back and underwent two discectomies. (R. at 42.) Shular said that he returned to light-duty work until October 2014. (R. at 43.) While working light-duty, Shular said that he was allowed to sit or lie down at work as needed. (R. at 43-44.) Shular said that he was eventually laid off from work. (R. at 45.)

Shular testified that he did not experience back pain, but he had chronic pain in his left leg. (R. at 46.) He said that his pain medication did not help much (R. at 46-47.) He said that his doctor had prescribed a cane for him because his leg would sometimes "give out." (R. at 47.) Shular said he suffered from gout in his left foot that would flare up a couple of time a month despite taking medication. (R. at 48.) Shular also said he suffered from mild COPD, which caused him difficulty breathing. (R. at 49-50.)

Shular testified that he could lift items weighing up to 20 pounds without increased pain. (R. at 52.) He said that he could sit for only 30 minutes before needing to change positions, he could walk only 50 yards before he needed to sit down, and he could not stand "long at all." (R. at 52.)

Shular said that all of his physical problems had affected him emotionally. (R. at 50.) Shular testified that he had difficulty sleeping, but he also testified that he

slept six or seven hours a night and two to four hours of the day. (R. at 50.) Shular said he was depressed, anxious and nervous and suffered from random panic attacks. (R. at 51.) He said that he had problems with his memory and concentration. (R. at 53.)

Shular testified that some days were better than others and that on good days he would use a riding lawnmower to mow a family graveyard, do laundry or go hunting. (R. at 54.) He said that he had gone hunting about 10 times for two to three hours at a time in the past year. (R. at 54.) Shular also testified that he would ride an ATV to where he hunted or to exercise his dog. (R. at 55.) Shular said that on bad days he would lie in bed. (R. at 56.)

John F. Newman, a vocational expert, also was present and testified at Shular's hearing. (R. at 63-68.) Newman testified that the description of Shular's past work as a mine electrician better fit the physical demands of an equipment repairman and a mine laborer. (R. at 64.) The ALJ asked Newman to assume a hypothetical individual of the claimant's age, education and past work experience, who was limited to light work, could occasionally crawl, crouch, kneel, stoop, climb ramps, stairs, ladders, ropes and scaffolds, but could not work around vibration or hazards, such as machinery or unprotected heights. (R. at 65.) Newman said such an individual could not perform any of Shular's past relevant work, but could perform the jobs of an assembler, a packer and an inspector, tester and sorter. (R. at 65-66.) The ALJ asked Newman to further assume that the above individual could not climb ladders, ropes or scaffolds, could not work around respiratory irritants and would be limited to performance of simple, routine tasks, performed in a work environment with few day-to-day changes. (R. at 66.) Newman said such an individual could perform the jobs he previously had listed. (R. at 66.)

The ALJ also asked Newman to consider the same individual, but who was limited to sedentary[4] work. (R. at 66.) Newman said that such an individual could perform work as a final assembler, a stuffer/packer and an inspector. (R. at 67.) The ALJ asked Newman to consider the same individual, but who would be off task for approximately 20 percent of the workday. (R. at 67.) Newman said that there would be no jobs such an individual could perform. (R. at 67.)

In rendering his decision, the ALJ reviewed records from the Virginia Workers Compensation Commission and medical records from Food City Pharmacy; CVS Pharmacy; Renaissance Surgery Center; Sapling Grove Family Physicians; Bristol Regional Medical Center; Highlands Neurosurgery, P.C.; Medical Associates of Southwest VA – Cloverleaf; Lonesome Pine Hospital; Stone Mountain Health – St. Charles Clinic; Kellie W. Brooks, F.N.P.; Wellmont Cardiology Services; Wellmont Medical Associates; Paige Cordial, Psy.D.; Holston Medical Group; Dr. Mark D. Russ, M.D.; and Associated Orthopaedics of Kingsport.

As stated above, the medical evidence shows that Shular suffered a work-related low back injury in September 2012. (R. at 208-11.) On October 17, 2012, Shular underwent a left L5-S1 partial hemilaminotomy and discectomy and foraminotomy, with partial laminotomy at S1-S2, performed by neurosurgeon Dr. Matthew W. Wood, Jr., M.D. (R. at 321-22.) On October 22, 2012, an MRI of

---

[4] Sedentary work involves lifting items weighing up to 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking or standing is often necessary in carrying out job duties. Jobs are sedentary if walking or standing are required occasionally and other sedentary criteria are met. See 20 C.F.R. § 404.1567(a) (2019).

Shular's lumbar spine showed a disc fragment was encroaching on the left S1 nerve root. (R. at 325-36.) Shuler was admitted to Bristol Regional Medical Center the following day, and Dr. Wood performed another L5-S1 partial hemilaminotomy and discectomy to remove the disc fragment. (R. at 330-33.)

After surgery, Shular treated with Dr. Wood through at least June 17, 2013. (R. at 533-39.) On November 19, 2012, Shular reported being stiff and feeling discomfort if he sat very long. (R. at 539.) Shular said his leg pain was "nearly gone." (R. at 539.) Dr. Wood noted that Shular's examination was benign, with normal gait, full range of motion and normal curvature. (R. at 539.) On December 17, 2012, Shular reported doing well except for some occasional leg pain and sciatica at night. (R. at 538.) Dr. Wood, again, noted that Shular's examination was benign, and Dr. Wood recommended that Shular start physical therapy. (R. at 538.)

On January 21, 2013, Dr. Wood noted that Shular was doing well and had made progress in physical therapy. (R. at 537.) Shular complained of left leg pain after stretching his hamstrings at therapy and in the mornings. (R. at 537.) Dr. Wood noted no focal weakness in either of Shular's lower extremities. (R. at 537.) He encouraged Shular to continue his physical therapy and to continue walking as much as possible. (R. at 537.) On February 25, 2013, Shular reported that physical therapy helped his lower back pain, but had caused a "resurgence" of his radicular left leg pain. (R. at 536.) Shular denied any weakness or foot drop. (R. at 536.) Dr. Wood noted moderately positive straight leg raising at about 70 degrees on the left. (R. at 536.) Dr. Wood ordered another MRI, but noted that, if it showed only post-operative changes, Shular would need to increase his efforts at stretching and range of motion. (R. at 536.) On March 4, 2013, Dr. Wood noted that Shular's recent MRI did not show any recurrence of a herniated disc. (R. at 535.) Dr. Wood released

Shular to return to work with no strenuous or heavy lifting. (R. at 535.)

On April 22, 2013, Shular returned to Dr. Wood complaining of "as much left leg pain as he did before his surgery." (R. at 534.) Dr. Wood noted that Shular had returned to work at "limited duty." (R. at 534.) Dr. Wood stated that Shular's straight leg raising was negative bilaterally with some hamstring tightness noted. (R. at 534.) He noted no focal weakness and normal gait, but he said that Shular moved slowly. (R. at 534.) Dr. Wood ordered an EMG to look for possible overt nerve root injury. (R. at 534.) On June 17, 2013, Dr. Wood noted that Shular was neurologically stable and intact. (R. at 533.) Dr. Wood stated that Shular's straight leg raising was negative, and his station and gait were normal. (R. at 533.) Dr. Wood noted that Shular was working within his restrictions. (R. at 533.) He also stated that Shular was at maximum medical improvement. (R. at 533.)

Shular treated with Karen J. Stallard, F.N.P., with Wellmont Medical Associates, in 2014. (R. at 339-84.) On January 14, 2014, Shular saw Stallard for his hypertension and anxiety. (R. at 382.) Shular reported that gabapentin helped his back pain. (R. at 383.) He specifically denied being nervous or anxious. (R. at 383.) He also denied any confusion, sleep disturbance, dysphoric mood or agitation. (R. at 383.) Stallard noted that Shular was oriented and had a normal mood and affect. (R. at 384.) She stated that Shular exhibited normal ranges of motion with tenderness in his lumbar sacral spine. (R. at 384.)

Stallard saw Shular again on April 14, 2014. (R. at 372-75.) Shular reported trouble sleeping and feeling nervous. (R. at 372.) He said that Valium helped him calm down, and Zoloft had helped him, but he believed he needed his dosage increased. (R. at 372.) Under the review of Shular's systems, he denied any

musculoskeletal myalgias and joint swelling. (R. at 374.) On physical examination, Stallard noted normal ranges of motion and normal mood, affect, behavior and thought content. (R. at 374.)

On July 14, 2014, Shular complained to Stallard of trouble sleeping and feeling nervous and down. (R. at 358.) Shular reported that he worked night shift, but experienced trouble sleeping whether during the day or night. (R. at 358.) Shular also complained of back pain, but he denied being nervous, anxious or agitated. (R. at 360.) On physical examination, Stallard noted that Shular was oriented and in no distress, he had normal musculoskeletal range of motion and normal mood, affect, behavior and thought content. (R. at 360-61.)

On September 16, 2014, Shular complained that his left foot hurt when he wore his work boots. (R. at 344.) Shular complained of back pain and sleep problems, but he denied any confusion, dysphoric mood, agitation, nervousness or anxiety. (R. at 346.) On physical examination, Stallard noted normal musculoskeletal range of motion, but said that Shular exhibited unspecified tenderness. (R. at 346.) She also noted that Shular was alert and oriented and had a normal mood, affect, behavior and thought content. (R. at 347.)

On March 9, 2015, Joseph Leizer, Ph.D., a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), of Shular's mental condition. (R. at 74-75.) Leizer stated that Shular had no restrictions on activities of daily living and he had not experienced any difficulties in maintaining concentration, persistence or pace or repeated episodes of decompensation, each of extended duration. (R. at 74.) He also stated that Shular experienced mild difficulties in maintaining social functioning. (R. at 74.)

On March 24, 2015, state agency physician Dr. Richard Surrusco, M.D., completed a Physical Residual Functional Capacity Assessment of Shular's condition. (R. at 76-77.) Dr. Surrusco stated that Shular could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. (R. at 76.) He stated that Shular could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday. (R. at 76.) Dr. Surrusco stated that Shular could occasionally climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch and crawl and could frequently balance. (R. at 76-77.)

Shular treated with Stone Mountain Health at the St. Charles Clinic beginning in January 2015. (R. at 405-34.) Shular saw Kellie Brooks, F.N.P., at St. Charles Clinic to establish care on January 13, 2015. (R. at 431-34.) Shular reported that he had undergone two discectomies in 2012. (R. at 431.) Shular reported being laid off from work in 2014. (R. at 431.) Shular reported taking gabapentin for left radicular pain since 2012. (R. at 431.) Shular also reported high blood pressure, sinus problems and back and foot pain. (R. at 431.) Brooks noted complaints of back pain and sciatica, but Shular denied any complaints of joint pain, stiffness or limitation of movement or muscle pain or weakness. (R. at 432.) Shular also complained of depression and sleep disturbance, but denied any symptoms of anxiety, disturbing thoughts or feelings. (R. at 432.) Brooks noted that Shular's gait was normal. (R. at 433.) She also noted that Shular had appropriate judgment, good insight, proper orientation, euthymic mood and appropriate affect. (R. at 433.) Shular saw Brooks on February 9, March 24, and May 6, 2015, for his regular follow-up appointments. (R. at 415-17, 421-30.) Brooks's notes for these appointments are identical to her initial notes. (R. at 415-17, 421-30.) On May 6, 2015, Brooks referred Shular to Sarah Lyall for mental health treatment. (R. at 417.)

On May 13, 2015, Shular saw Sarah Lyall, M.S., psychology intern, with Stone Mountain Behavioral Health Services, for an intake assessment. (R. at 412-13.) Schular was accompanied by his wife because he said that he did not like to talk and thought she could better describe his symptoms. (R. at 412.) Shular said that he had been laid off from work the previous year, and his symptoms had increased since that time. (R. at 412.) Shular's wife stated that he was irritable much of the time and got angry easily and hit objects. (R. at 412.) She also complained that Shular spent large amounts of money they did not have because he fixated on obtaining certain items. (R. at 412.) She said that, after Shular obtained the wanted item, he would be content for a while, but he would later become depressed due to his regret due to the financial damage he caused. (R. at 412.) According to Shular and his wife, Shular's mental health symptoms existed long before Shular's work injury and back surgery. (R. at 412.) Lyall diagnosed bipolar disorder, unspecified. (R. at 413.) Lyall noted that she was referring Shular to Paige Cordial, Psy.D., for testing for his disability claim. (R. at 413.)

Shular saw Lyall again on May 27, 2015, and he complained of feeling hopeless and down because he could not work. (R. at 409.) He complained of spending a lot of time worrying and dwelling on "things." (R. at 409.) He said his symptoms worsened because he had been denied disability benefits. (R. at 409.) Shular claimed that he did not do too much due to back pain. (R. at 409.) Shular also complained of experiencing a panic attack a few days earlier. (R. at 409.) Lyall and Shular discussed Shular being more active and filling his time so that he would not worry. (R. at 409-10.)

Brooks saw Shular again on June 5, July 7, August 7, September 14 and November 13, 2015, and her notes were identical to Shular's previous appointments

with her. (R. at 406-07, 601-20.)

Brooks completed an Assessment Of Ability To Do Work-Related Activities (Physical) for Shular on July 7, 2015. (R. at 440-42.) On this assessment, Brooks stated that Shular could occasionally lift and carry items weighing up to 35 pounds and frequently lift and carry items weighing up to 20 pounds based on a history of degenerative disc disease. (R. at 440.) Brooks stated that Shular could stand and walk for only two hours in an eight-hour workday and for only 10 minutes at a time. (R. at 440.) Brooks also stated that Shular could sit for only four hours in an eight-hour workday and for only 30 minutes at one time. (R. at 441.) She stated that Shular could occasionally climb, stoop, kneel, balance, crouch and crawl. (R. at 441.) She also stated that Shular's ability to reach, to handle, to feel, to push and pull and to speak were not affected by his impairments. (R. at 441.)  She stated that Shular had a visual impairment and decreased hearing that affected his ability to see and hear. (R. at 441.) She further stated that there were no environmental restrictions caused by Shular's impairments. (R. at 442.) Brooks checked a statement that Shular would be absent from work more than two days a month due to his impairments and/or treatment. (R. at 442.)

Brooks also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form on July 7, 2015. (R. at 761-63.)  On this form, Brooks stated that Shular suffered a moderate or slight limitation, but was capable of functioning satisfactorily, in making all occupational adjustments and in his ability to understand, remember and carry out detailed and simple job instructions. (R. at 761-62.) Brooks stated that Shular had a mild limitation in his ability to maintain personal appearance and marked limitation in this ability to understand, remember and carry out complex job instructions, to behave in an emotionally stable manner, to relate

predictably in social situations and to demonstrate reliability. (R. at 761-62.) In support of her assessment, Brooks stated only that Shular suffered from anxiety, depression and poor sleep. (R. at 762.) She also stated that Shular would be absent more than two days a month due to his impairments and/or the treatment for his impairments. (R. at 763.)

Shular underwent a consultative psychological evaluation by Paige Cordial, Psy.D., a licensed clinical psychologist, on July 31, 2015, at the request of his counsel. (R. at 649-54.) Cordial noted that Shular appeared alone for his appointment and was casually and neatly dressed, he was adequately groomed, his insight and judgment were fair, his mood appeared slightly anxious, his affect was congruent with his mood, his speech patterns were normal in rate and rhythm and suggestive of linear and logical thought patterns, he answered questions directly and succinctly, and he did not have problems getting off task, and he appeared nervous, but was friendly. (R. at 648.) Cordial stated that Shular did not report any problems with his vision, hearing or reading abilities. (R. at 648.) She said that Shular appeared to give his best effort. (R. at 648.)

Shular stated that his father could be verbally abusive and used corporal punishment, but he denied experiencing any physical or other form of abuse or neglect as a child. (R. at 649.) Shular reported that he had a good relationship with his family. (R. at 649.) Shular said that he had been married for 24 years and had a 23-year-old daughter and 16-year-old son. (R. at 649.) Shular said his marital relationship was "okay," but he had good relationships with his children. (R. at 649.) Shular also stated that he maintained a few friendships. (R. at 650.) Shular stated that he did "okay" interpersonally, but did not like to be around a large group of people. (R. at 650.)

Shular reported that he graduated from high school and received two years of vocational training to be an electrician. (R. at 650.) He said that he was never in special education classes and never diagnosed with a learning disorder. (R. at 650.) He reported that he got along well with other children in school. (R. at 650.) After finishing school, Shular stated that he worked for a foundry for 10 ½ years before being laid off. (R. at 650.) Shular reported that he suffered a ruptured disc in his back at work in 2012. (R. at 650.) Shular said that he had surgery to repair his ruptured disc, but it ruptured again, requiring another surgery. (R. at 650.) Shular said that he was out of work for five months before returning to work at light duty. (R. at 650.) Shular said that he continued to work until he was laid off from his light-duty job in 2014. (R. at 650.)

Shular reported significant chronic pain in his back. (R. at 650.) He denied any other injuries or traumas. (R. at 650.) He reported a long history of depression and taking antidepressant medication for more than 10 years. (R. at 650.) He said that his medication had been moderately helpful. (R. at 650.) Shular said that he participated in counseling on three occasions. (R. at 650.) Shular stated that he witnessed his father-in-law being exhumed so his remains could be moved into a vault, and this caused him symptoms of post-traumatic stress disorder. (R. at 650.)

Cordial noted that Shular's medical records reflected that he was prescribed Abilify, atenolol, citralopram, cyclobenzaprine, gabapentin, Nexium, testosterone cypionate injections and Valium. (R. at 650.) His most recent diagnoses included tobacco use, hypertension, lumbago, intervertebral disc disorder with myelopathy, lumbar region, testicular hypofunction, depressive disorder not elsewhere classified, esophageal reflux, malaise and fatigue, unspecified sleep disorder and otitis media. (R. at 650.) Cordial noted that Shular's therapist had diagnosed him with bipolar

disorder, unspecified type. (R. at 650.)

Shular reported low energy levels and being easily fatigued, feeling tired all the time and frequently wanting to lie in bed all day. (R. at 651.) Shular reported restlessness during sleep and difficulty falling and staying asleep. (R. at 651.) He said he suffered from low motivation, feeling hopeless, low mood and irritability. (R. at 651.) He said that his depression had worsened since he was laid off from his job. (R. at 651.) Shular stated that the worried constantly, had difficulty relaxing and had problems with anger. (R. at 651.) He denied being violent toward others, but he stated that he had punched holes in walls in the past. (R. at 651.) Shular said that he felt especially nervous at times, but he said that he did not suffer panic attacks. (R. at 651.) He said that he, on occasion, experienced racing thoughts and having trouble concentrating, but he denied any problems with cognition or memory. (R. at 651.) Shular said that he drank caffeine "constantly." (R. at 651.)

Cordial administered the Kaufman Brief Intelligence, Second Edition, ("K-BIT II"), on which Shular scored in the average range on verbal, nonverbal and IQ composite scores. (R. at 651.) Shular's results on the Beck Depression Inventory, Second Edition, ("BDI-II"), indicated symptoms of a severe level of depression. (R. at 651.) His results on the Beck Anxiety Inventory, ("BAI"), indicated a moderate level of anxiety. (R. at 652.) Results on the PTSD Checklist-Civilian Form indicated that Shular was experiencing some symptoms congruent with PTSD symptoms. (R. at 652.) Shular's results on the Minnesota Multiphasic Personality Inventory – 2, ("MMPI2"), showed that he reported a much larger than average number of symptoms rarely described by individuals with genuine, severe psychopathology. (R. at 652.) Cordial stated, "The level of infrequent responding may occur in individuals with genuine, severe psychopathology who report credible symptoms,

but it could also reflect over-reporting." (R. at 652.) Cordial stated that Shular's results should be interpreted in light of this caution. (R. at 652.) Cordial reported that Shular reported "a diffuse and pervasive pattern of somatic complaints involving different bodily systems including head pain, a number of vague neurological complaints, and a number of gastrointestinal complaints." (R. at 652.)

Shular reported feeling anxious, intrusive ideation and nightmares and feeling sad, unhappy and dissatisfied with his current life circumstances. (R. at 652.) He complained of significant depression. (R. at 652.) Shular also reported significant persecutory ideation, unusual thought processes, including thought disorganization, engaging in unrealistic thinking and believing he has unusual sensory-perceptual abilities. (R. at 653.) Shular also reported a significant history of acting out, antisocial behavior, problematic behavior at school, conflictual family relationships, avoiding social situations, cynical beliefs and a hostile view and distrust of others. (R. at 653.)

Cordial said that Shular appeared to meet the criteria for major depressive disorder, recurrent, severe, without psychotic features, with anxious distress. (R. at 653.) Cordial said that Shular's symptoms were not severe enough to warrant a diagnosis of PTSD. (R. at 653.) She also said that she did not have enough information to confirm Shular's therapist's bipolar disorder diagnosis. (R. at 653.)

Cordial also completed a Medical Assessment of Ability To Do Work-Related Activities (Mental) form on August 3, 2015. (R. at 655-57.)  On this form, Cordial stated that Shular suffered marked or serious limitations in his ability to deal with work stresses. (R. at 655.) Cordial stated that Shular was able to function satisfactorily or better in all of his other mental work-related abilities. (R. at 655-

56.) Cordial stated that Shular's impairments or treatment would cause him to miss about two days a month from work. (R. at 657.)

On July 15, 2015, state agency physician Dr. Lewis Singer, M.D., completed a Physical Residual Functional Capacity Assessment of Shular's condition. (R. at 88-90.) Dr. Singer stated that Shular could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. (R. at 88-89.) He stated that Shular could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday. (R. at 89.) Dr. Singer stated that Shular could occasionally climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch and crawl and could frequently balance. (R. at 89.) He also stated that Shular should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 90.)

On July 16, 2015, state agency psychologist Leizer completed another PRTF of Shular's mental condition. (R. at 86-87.) Leizer stated that Shular had no restrictions on activities of daily living, and he had not experienced repeated episodes of decompensation, each of extended duration. (R. at 87.) He also stated that Shular experienced mild difficulties in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 87.)

On January 13, 2016, Shular specifically denied any feelings of being down, depressed or hopeless to Brooks. (R. at 594.) She noted that Shular's mood was stable. (R. at 592.) Otherwise, Brooks's notes of Shular's complaints and her examination were identical to her earlier reports. (R. at 592-98.) X-rays of Shular's lumbosacral spine, taken on January 13, 2016, showed only mild degenerative changes at the L4-5 and L5-S1 levels. (R. at 600.) Despite the fact that Brooks's notes document that Shular repeatedly denied any anxiety, she repeatedly prescribed

him Valium. Shular continued to treat with Brooks at St. Charles Clinic through January 5, 2017. (R. at 541-643.)

Shular saw Dr. Marc W. Mayhew, M.D., with Wellmont CVA Heart Institute, on May 4, 2016, for complaints of shortness of breath. (R. at 456.) Dr. Mayhew noted that Shular had been diagnosed with mild COPD, but his symptoms were out of proportion to his pulmonary disease. (R. at 456.) Shular complained of left-sided chest pain upon deep breathing one to two times a week. (R. at 456.) Dr. Mayhew ordered a stress test and echocardiogram, both of which revealed normal results. (R. at 444-51, 460.)

Shular treated with Dr. Ryland Pratt Byrd, M.D., with Wellmont Health Systems for moderate COPD from February 2 to July 26, 2016. (R. at 465-88.) Shular apparently first saw Ramona Romano, N.P., in the office on February 2, 2016. (R. at 476, 484-86.) Shular complained of witnessed apneas, snoring, daytime fatigue, excessive daytime sleepiness, constant tiredness and shortness of breath with exertion and at rest. (R. at 476.) Shular reported suffering from back pain, but he denied any psychiatric or behavioral problems. (R. at 486.) Romano noted normal musculoskeletal range of motion and normal reflexes. (R. at 486.) She also noted normal mood, affect and behavior. (R. at 487.)

On April 4, 2016, Romano saw Shular to discuss results of his sleep study. (R. at 477-82.) Romano noted that Shular's results showed no significant obstructive sleep apnea. (R. at 477.) She recommended weight loss and avoidance of sleeping in the supine position. (R. at 477.)

Dr. Byrd saw Shular on April 18, 2016, for complaints of shortness of breath

and fatigue. (R. at 471-74.) Dr Byrd noted that Shular had a history of cigarette smoking of up to two packs per day from age 13 until 2015 when he started vaping. (R. at 471.) Shular claimed he became short of breath after walking 50 feet or one-half a flight of stairs. (R. at 471.) He also complained of left-sided chest pain and pressure. (R. at 471.) Dr. Byrd diagnosed moderate COPD, but he noted that Shular's symptoms seemed out of proportion with his measured lung function, suggesting possibly coronary artery disease. (R. at 474.)

Dr. Byrd saw Shular for follow up on July 26, 2016. (R. at 465-67.) Shular said that samples of Incruse provided on his previous visit had helped a little, but not enough for him to call for a prescription. (R. at 465.) Dr. Byrd noted that a stress test and echocardiogram performed in May 2016 were normal. (R. at 466.) Dr. Byrd provided Shular with samples of Breo. (R. at 469.)

Shular saw Brooks at St. Charles Clinic on February 24, 2017, complaining of being more depressed, irritable and angry. (R. at 748-55.) His wife reported that Shular was not bathing daily, had not bathed in a week and sometimes went as long as a month without bathing. (R. at 748.) Brooks noted that Shular's gait was normal, and there was no joint instability in his left leg. (R. at 750.)

Shular was seen in the emergency department at Lonesome Pine Hospital on April 3, 2017, for injury to his right hand. (R. at 665-71.) Shular reported injuring his hand when he punched his truck because a pharmacy refused to refill his Lortab prescription. (R. at 665.) Shular denied any problems with back pain or any mental health problems. (R. at 667.) The examining physician noted normal mood, affect and behavior. (R. at 668.) X-rays of Shular's right hand showed a questionable fracture of the distal fifth metacarpal bone. (R. at 669.) Shular was referred to an

orthopedic physician for follow up. (R. at 669.)

Shular saw Dr. Mark D. Russ, an orthopedic physician, on April 11, 2017, for his hand fracture. (R. at 726-27.) Dr. Russ diagnosed a nondisplaced fracture of the fifth metacarpal and placed Shular's hand in an ulnar gutter splint. (R. at 727.)

When Shular saw Brooks on April 20, 2017, Shular's broken hand was in a cast. (R. at 710-18.) Shular complained of left leg pain, burning and weakness, and he requested a cane. (R. at 710.) Shular stated that he was "in the bed all of the time" because he was in so much pain he could not stand it. (R. at 710.) Shular said that he was anxious and nervous, and he wanted to increase his Valium dosage. (R. at 710.)

Shular returned to see behavioral health at St. Charles Clinic on April 20, 2017. (R. at 719-25.) It appears Shular was seen by Ava Martin, but there is no listing of her qualifications. Martin noted that Shular reported suffering from depression his entire life. (R. at 719.) Shular stated that he had "a miserable life." (R. at 719.) Martin noted that Shular was alert and oriented, normally dressed and groomed and engaged. (R. at 719.) Shular reported, that after being hurt at work five years earlier, he had started drinking a lot and became depressed; he said it had hurt his marriage. (R. at 719.) Shular claimed that he was sober for three years from alcohol use. (R. at 719.)

On May 4, 2017, it appears that Brooks referred Shular back to behavioral health after he and his wife "had been asking for medications that she wasn't comfortable giving them." (R. at 700.) Martin also noted that Brooks reported that Shular "had been generally unfocused on actually getting better but appeared to be

presenting with a disabled mindset and medication-seeking." (R. at 700.) Shular described his mood as having no drive to do anything anymore. (R. at 700.) Shular said that becoming disabled had broken his spirit. (R. at 700.) Shular reported that he had suffered from depression his whole life. (R. at 700.) Shular stated that all he wanted to do was to lie in bed and cry. (R. at 700.) Martin noted that Shular was alert and fully oriented, dressed and groomed normally and engaged during their session. (R. at 700.) She noted that his mood and affect were depressed. (R. at 700.) While Shular stated that he had previously planned suicide, Martin stated there was no current indication of suicidal or homicidal intent. (R. at 700.)

A neurography and electromyography performed on Shular on May 15, 2017, showed no evidence of an active lumbosacral radiculopathy or a peripheral neuropathy. (R. at 757-58.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is

unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp. 2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Shular argues that the ALJ failed to properly evaluate his impairments in determining his residual functional capacity. (Plaintiff's Memorandum In Support Of His Motion For Summary Judgment, ("Plaintiff's Brief"), at 4-6.) In particular, Shular argues that the ALJ's finding on his residual functional capacity is not supported by substantial evidence. (Plaintiff's Brief at 4-6.)

The ALJ found that Shular had the residual functional capacity to perform light work, to stand and/or walk six hours in a workday, sit six hours in a workday,

occasionally climb ramps and stairs, crawl, crouch, kneel and stoop, and never climb ladders, ropes or scaffolds, work around pulmonary irritants, vibration or hazards, such as machinery or unprotected heights. (R. at 20-25.) The ALJ found that Shular could perform simple, routine tasks in a work environment with few day-to-day changes. (R. at 20.) In reaching the determination as to Shular's residual functional capacity, the ALJ stated that he was giving "significant weight" to the residual functional capacity assessment of the state agency medical consultant, Dr. Lewis Singer, M.D. (R. at 22). The ALJ also said that he was giving the opinions of Nurse Practitioner Brooks "some weight" because they were supported by the other evidence of record. (R. at 22.) The ALJ stated that he was giving the opinions of the examining consultative psychologist, Paige Cordial, "moderate weight" based on the fact that she had performed a one-time evaluation of the Shular. (R. at 24.)

Based on my review of the ALJ's decision, I find that substantial evidence exists to support the ALJ's weighing of the medical evidence and his finding as to Shular's residual functional capacity. It is important to note that Shular's treating neurosurgeon, Dr. Wood, returned Shular to work with no heavy lifting within months of his two surgeries. And, Shular returned to work and worked at light duty until his employer laid him off. In March 2015, state agency physician Dr. Surrusco stated that Shular could occasionally lift and carry up to 20 pounds and frequently lift and carry up to 10 pounds. He stated that Shular could stand and/or walk for about six hours and sit for about six hours in an eight-hour workday. Dr. Surrusco stated that Shular could occasionally climb ramps/stairs/ladders/ropes/scaffolds, stoop, kneel, crouch and crawl and could frequently balance. On July 15, 2015, state agency physician Dr. Singer agreed with Dr. Surrusco's assessment, adding only that that Shular should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 90.)

The only provider to place any more serious restrictions on Shular's work-related physical abilities is Brooks. The only area where Brooks restricted Shular's work-related abilities further is his ability to stand, walk and sit. Brooks stated that Shular could stand and walk for only two hours in an eight-hour workday and for only 10 minutes at a time and that he could sit for only four hours in an eight-hour workday and for only 30 minutes at one time. Brooks gave no explanation for these restrictions on her assessment. Furthermore, Brooks's treatment notes over the course of her treatment show little or no objective findings and few subjective complaints to support such severe restrictions. Also, Shular's diagnostic testing has shown no recurrent herniation and no evidence of lumbar radiculopathy or neuropathy.

I find that this evidence supports the ALJ's decision to give Brooks's opinion "some weight," but not controlling weight. I also find that this evidence supports the ALJ's finding as to Shular's physical residual functional capacity. I further find that the evidence supports the ALJ's decision to give "moderate weight" to Cordial's opinion regarding Shular's mental residual functional capacity. Cordial stated that Shular suffered marked or serious limitations in his ability to deal with work stresses, but Shular was able to function satisfactorily or better in all of his other mental work-related abilities. The ALJ's finding that Shular could perform simple, routine tasks in a work environment with few day-to-day changes in not contradicted by Cordial's assessment. Insofar as the ALJ's finding as to Shular's mental residual functional capacity contradicts Brooks's opinions, the ALJ was justified in giving less weight to Brooks's opinions than to Cordial's because Brooks is not a mental health treatment provider. *See* 20 C.F.R. § 404.1527(c)(5) (2019).

An appropriate Order and Judgment will be entered affirming the Commissioner's decision denying Shular 's claim for benefits.

DATED:      March 20, 2020.

/s/ *Pamela Meade Sargent*

UNITED STATES MAGISTRATE JUDGE